| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | No. 17 CV 324 (13 CR 863) |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JOHN SMITH, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

## MEMORANDUM OPINION AND ORDER

John Smith, a federal inmate proceeding *pro se*, has filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.[1] R. 1, Pet.'s Br.[2] A jury found Smith guilty on four counts of heroin distribution, in violation of 21 U.S.C. § 841(a)(1). Cr. R. 70, 07/17/14 Minute Entry. In April 2015, Smith was sentenced to 216 months of imprisonment. Cr. R. 125, Sentencing J. at 2. His conviction was affirmed by the Seventh Circuit, and this motion followed. *United States v. Smith*, 818 F.3d 299 (7th Cir. 2016). Now, Smith challenges his sentence, claiming that he received ineffective assistance of counsel and that the Court inaccurately applied the career offender enhancement under the Sentencing Guidelines. Pet.'s Br.; R. 17, Pet. Mot. Am. For the following reasons, Smith's motion is denied and no certificate of appealability will issue.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 2255 and 28 U.S.C. § 1331.

[2]Citations to the § 2255 civil docket are indicated with an "R." followed by the entry number and, if appropriate, a page or paragraph number. The criminal docket, *United States v. Smith,* No. 1:13-cr-00863-1 (N.D. Ill. April 13, 2015), is noted as "Cr. R."

# I. Background

In October 2013, Smith was charged by complaint with knowingly and intentionally distributing heroin. Cr. R. 1, Compl. at 1. In sum, a confidential source agreed to buy heroin from Smith for the FBI's investigation, leading to controlled purchases of heroin in October and November 2010. Compl. ¶ 6. Law enforcement surveilled each transaction and recorded the meetings and interactions of Smith with the confidential source. *Id.*

When preparing for trial, in December 2013, the United States Attorney's Office filed an "Information Stating Previous Drug Conviction to be Relied Upon in Seeking Increased Punishment," 21 U.S.C. § 851, providing notice to Smith and his counsel that the government would seek an enhanced sentence if Smith was convicted on the fourth count in the indictment. Cr. R. 45, Information. That charge was for intentionally distributing more than 100 grams of heroin. Cr. R. 16, Indictment at 4; *see also* 21 U.S.C. § 841(a)(1). The government alleged that in a November 2010 meeting between the confidential source and Smith, Smith sold the confidential source 109 grams of heroin. Compl. ¶ 33-45.

In the § 851 Information, the government identified several previous drug convictions that would qualify Smith for the enhanced penalty. Specifically, Smith was convicted of: manufacture or delivery of a controlled substance in June 1998 in Cook County; possession of a controlled substance in September 2004 in Cook County; trafficking in drugs in October 2006 in Cuyahoga County, Ohio; and

possession of a controlled substance in November 2007 in Cook County. Information at 1-2.[3]

In June 2014, Smith's counsel and the government attended a pretrial conference where this Court ruled on motions *in limine*. Cr. R. 51, 06/23/14 Order Mot. Lim. The government had previously filed consolidated motions *in limine* on the admissibility of the video and audio recordings of each sale. Cr. R. 43, Gov.'s Mot. Lim. This Court granted the motion to admit, as there was proper foundation for the video and audio recordings even without a participating witness's testimony, and left open the opportunity for Smith's counsel to make specific hearsay objections. 06/23/14 Order on Mot. Lim. at 1-2. At trial, the government used the recordings in its case in chief, as well as recordings of Smith's phone calls during his pretrial detention.

After trial, during jury deliberations, the jury sent notes to the Court. In one, a juror expressed concern about another juror's overbearing conduct. Cr. R. 104, Trial Tr. 772.[4] The Court consulted with the parties, eventually directing the jury to re-read the *Silvern* instruction, and deliberations continued. *Id.* at 776. In another, a juror expressed reservations about coming to a decision. Cr. R. 105, Trial Tr. 781. Again, the Court consulted with both parties, and with the agreement of the defense, instructed the jurors to continue deliberations. *Id.* at 787. The jury ultimately convicted Smith on all counts. Cr. R. 71, Jury Verdict. The Court sentenced Smith to 216 months in prison. Sentencing J. at 2. The Seventh Circuit

---

[3]Those case numbers are 97 CR 75001, 04127312501, CR-06-485644-B, and 04 CR 2824101 respectively.
[4]The full trial transcript is reported by volume on the docket, Cr. R. 98-105.

affirmed his conviction in March 2016, *United States v. Smith,* 818 F.3d 299 (7th Cir. 2016), after which Smith timely filed this motion.

## II. Legal Standard

### A. 28 U.S.C. § 2255

Under 28 U.S.C. § 2255, a prisoner in custody pursuant to a federal sentence may move to vacate his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack ...." 28 U.S.C. § 2255. In other words, to obtain relief under § 2255, Smith must show that the error asserted is "jurisdictional, constitutional, or is a fundamental defect which inherently results in a complete miscarriage of justice." *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997).

Section 2255, however, "is not a substitute for a direct appeal." *Id.* at 706; *see also Qualls v. United States*, 774 F.2d 850, 851 (7th Cir. 1985) (citing *United States v. Addonizio*, 442 U.S. 178, 184 (1979)). Consequently, "[i]f any issue could have been raised on direct appeal, the failure to take such appeal precludes review pursuant to a section 2255 motion unless the petitioner can show 'cause' for the procedural default and 'actual prejudice' resulting from the errors of which the petitioner complains." *Qualls*, 774 F.2d at 851 (quoting *United States v. Frady*, 456 U.S. 152, 167 (1982)); *see also Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir. 1988). There is an exception, however, for ineffective-assistance claims, which

are not subject to the "cause and prejudice" standard. *See Massaro v. United States*, 538 U.S. 500, 503 (2003) ("[T]here is no procedural default for failure to raise an ineffective-assistance claim on direct appeal."). That is because bringing ineffective assistance claims on direct appeal may create a risk that defendants feel compelled to raise the issue "before there has been an opportunity fully to develop" the factual claims. *Id.* at 504. Here, Smith's claims are largely—if not completely—based on allegations that his counsel was ineffective, so the Court proceeds under the *Strickland* standard.

## B. Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. To win on his ineffective-assistance-of-counsel claim, Smith must meet the familiar two-element standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Smith must show both that his trial counsel's performance was deficient and that prejudice resulted. *Id.* at 687. On the performance element, the question is whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Judicial review of trial counsel's performance "must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The Court must presume that "the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted). On the prejudice element, Smith must show that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### III. Analysis

### A. Plea Negotiations

First, Smith contends that he received ineffective assistance of counsel from his lawyer, Stuart Goldberg, in the plea bargaining process. Pet.'s Br. at 5. Defendants have a right to effective assistance of counsel not only for the ultimate criminal trial itself, but also for certain steps leading up to trial. *Missouri v. Frye,* 566 U.S. 134, 140 (2012). The Supreme Court recognizes that the right extends to plea negotiations, because "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky,* 559 U.S. 356, 373 (2010); *Frye,* 566 U.S. at 141; *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

To succeed on a claim of ineffective assistance in the plea bargaining process, Smith must show that his attorney's performance at the plea stage was deficient and that Smith was prejudiced by those deficiencies. *Strickland,* 466 U.S. at 687. Reasonably competent counsel in the plea bargaining phase will "attempt to learn all of the facts of the case, make an estimate of a likely sentence, and communicate the results of that analysis" before either allowing a client to plead guilty or opt for trial. *See Moore v. Bryant,* 348 F.3d 238, 241 (7th Cir. 2003). And although an attorney's analysis of the circumstances need not provide a "precisely accurate prediction" of the respective consequences of going to trial versus pleading guilty,

counsel's scrutiny "must be undertaken in good faith." *United States v. Barnes*, 83 F.3d 934, 939 (7th Cir. 1996).

To satisfy the prejudice element, a defendant must show a "reasonable probability" that "the outcome of the plea process would have been different with competent advice." *Gaylord v. United States*, 829 F.3d 500, 506 (7th Cir. 2016) (quoting *Lafler v. Cooper*, 566 U.S. 156, 163 (2012)). It is true that an attorney who fails to make a "meaningful attempt" to inform his or her client of an existing offer, or advises the client to reject a "highly favorable plea offer" by unreasonably asserting that the defendant would not be convicted at trial, has fallen below the Sixth Amendment standard. *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017); *see also Frye,* 566 U.S. at 144 ; *Lafler v. Cooper,* 566 U.S. 156, 163 (2012).

The problem for Smith is that those principles of plea bargaining do not help him because he was *not* actually offered a formal plea agreement. *Delatorre*, 847 F.3d at 845. This is similar to what happened in *Delatorre*, where a defendant argued that his counsel performed deficiently by failing to secure a plea deal with a maximum sentence of twenty-five to thirty years. *Id.* at 845-46. The government had suggested it would enter into a plea agreement *if* the defendant cooperated with law enforcement. *Id.* at 846. Under the circumstances—Delatorre had already confessed his involvement in three murders and made incriminating statements to an informant—his counsel believed that the government would only be willing to negotiate if Delatorre was one of the first gang members to cooperate. *Id.* Not surprisingly, Delatorre's lawyer advised him to "cooperate fully with the

government." *Id.* But Delatorre refused to cooperate. *Id.* The Seventh Circuit held that defense counsel could not be faulted for his client's refusal to cooperate nor for the "government's decision not to reward an uncooperative defendant with a plea agreement." *Id.* at 846. Under those circumstances, Delatorre's attorney performed reasonably, especially in light of the principle that "[t]he government is not required to offer any defendant such an agreement." *Id.*; *see also United States v. Hall,* 212 F.3d 1016, 1022 (7th Cir. 2000).

Here, as in *Delatorre,* there was only so much that Goldberg could have done for Smith in obtaining a favorable plea. "[T]he successful negotiation of a plea agreement involves factors beyond the control of counsel, including the cooperation of his client … as well as the cooperation of the prosecutor, who has no obligation to offer such an agreement." *Delatorre*, 847 F.3d at 846 (quoting *Hall*, 212 F.3d at 1022). Smith himself admits that he still does "not know if a plea deal was ever offered by the government." Pet.'s Br. at 7. Indeed, it appears that Goldberg *did* approach the government to engage in plea discussions, particularly asking that the government offer a plea without the enhanced sentence triggered by the prior drug convictions under 21 U.S.C. § 851(a). Gov.'s Resp. Br., Exh. 1 ¶ 3. In light of the substantial evidence against Smith, this was a reasonable attempt on Goldberg's part to get as favorable of a result as possible for his client. But after the prosecutors consulted with their supervisors, the government advised Goldberg that it would *not* be withdrawing the § 851 enhancement. Gov.'s Resp. Br., Exh. 1 ¶¶ 4-5. In light of Smith's criminal history (which included two drug trafficking convictions

and three convictions for illegal possession of a gun), that was not a surprising response. Just as the defendant in *Delatorre* could not blame his lawyer for the lack of a plea deal, it is simply not Goldberg's fault that the government refused to drop the sentencing enhancement or make any other formal plea offer.

For similar reasons, Smith falls short of showing that he suffered any prejudice, even assuming that Goldberg should have pestered the government more for additional plea discussions. Smith must show "at a minimum" that the "prosecutor would have actually offered him a deal had his attorney been competent." *Delatorre*, 847 F.3d at 846; *see also Frye,* 566 U.S. at 147-49. Nothing in the record suggests that the prosecutor would have offered Smith a deal (especially the lenient one that Smith was hoping for) if his attorney had only acted differently. Quite the contrary: in an affidavit, one of the prosecutors avers that the government refused Goldberg's request that it withdraw the sentencing enhancement, and that the government never formally offered *any* plea agreement in the case. Gov.'s Resp. Br., Exh. 1 ¶¶ 4-5. There is no reason to think that even the most vigorous, unrelenting defense counsel could have secured a favorable deal for Smith. No prejudice has been shown.

A final note on Smith's plea bargaining argument. On several occasions throughout his briefing, Smith requested an evidentiary hearing to further develop this argument. *See, e.g.*, Pet.'s Br. at 8; *Massaro*, 538 U.S. at 504-06. But an evidentiary hearing is only appropriate if Smith has alleged "facts that, if proven, would entitle him to relief." *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir.

2001) (quoting *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994)). If the motion, files, and records of the case "conclusively show that the prisoner is entitled to no relief," then an evidentiary hearing is not warranted. *Id.* at 597 (quoting 28 U.S.C. § 2255). Here, for the reasons already discussed, nothing Smith has alleged would alter the outcome. He does not lay out facts that amount to ineffective assistance; he only states conclusions and asks for a further opportunity to be heard on them. The record conclusively shows that the plea bargaining claim fails, so no hearing will be allowed.

### B. Audio and Video Recordings

Smith also contends that his counsel was ineffective for failing to object to the admission of audio and video recordings that led up to (and comprised) the drug deals. An ineffective assistance claim based on a failure to object is "tied to the admissibility of the underlying evidence." *Hough v. Anderson,* 272 F.3d 878, 898 (7th Cir. 2001). If the evidence admitted without objection was indeed admissible, then the defendant's argument necessarily fails. Because failing to object to admissible evidence is not legally unreasonable, nor could it change the outcome of a case, it fails both elements (performance and prejudice) of the *Strickland* test. *Id.* As the Seventh Circuit has stated, "[o]nly in a rare case will a court find ineffective assistance of counsel based upon a trial attorney's failure to make an objection that would have been overruled under the then-prevailing law." *Hough*, 272 F.3d at 898 (quoting *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999)).

In the motions *in limine* filed before the trial, the government sought a pretrial decision on the admissibility of the recordings without the informant's testimony at trial. Gov.'s Mot. Lim. at 1-6. Specifically, invoking a line of Seventh Circuit cases, the government proposed to lay the foundation for the recordings' admissibility using circumstantial facts, which would avoid the need to call the informant as a witness. *Id.* (citing *United States v. Collins,* 715 F.3d 1032 (7th Cir. 2013)) (upholding admission of recorded conversations without participant's testimony). The motions *in limine* also explained that allowing the recordings would not violate the Confrontation Clause, because the informant's statements on the recordings would qualify as Smith's adoptive admissions, and thus would not be hearsay governed by *Crawford v. Washington,* 541 U.S. 36 (2004). The defense did not object to the recordings, with the caveat that the government lay the requisite foundation as to who made them. 06/23/14 Order Mot. Lim. at 1.

The Court granted the motion, explaining that the recordings' foundation could be properly laid by an involved FBI agent's voice-recognition testimony. 06/23/14 Order Mot. Lim. at 1-2. The order also noted the supporting circumstantial evidence: Smith participated in calls using telephone numbers that he had previously provided to a car dealership, and his appearance and conduct at three of the four drug deals matched the details agreed-to in the calls attributed to him. *Id.* at 2.

Smith complains that Goldberg should have blocked the recordings from evidence by (1) making hearsay objections; (2) objecting on Confrontation Clause

grounds; and (3) subpoenaing the confidential informant to testify. Pet.'s Br. at 8-10. But it was reasonable for Goldberg to skip taking those fruitless steps. As an initial matter, when confronted with the government's motions *in limine,* Goldberg made sure to caution that he only had no objection as long as the government laid the proper foundation for the recordings. 06/23/14 Order Mot. Lim. at 1. In any event, the recordings were admissible, despite Smith's concerns over hearsay, the Confrontation Clause, and calling the informant to testify.

First, on hearsay, the relevant statements made by the informant were not directly introduced, standing alone, for the truth of the matters asserted. Instead, the statements were introduced as adopted admissions by Smith. As the defendant in the case, Smith was the opposing party to the government. And as the "opposing party," statements "made by" or "adopted" by Smith are "not hearsay." Fed. R. Evid. 801(d)(2)(A), (B). Of course this means that any statements directly made by Smith himself in the recordings were not hearsay—they were party admissions. It also means that the confidential informant's statements, to the extent that Smith agreed to them or otherwise adopted them (for example, by not refuting them), became his own statements by way of his adoption of them. *United States v. Ward,* 377 F.3d 671, 676 (7th Cir. 2004) ("[Defendant's] silence qualifies as an admission because his sister's accusation is the type of statement that a party normally would respond to if innocent"); Fed. R. Evid. 801(d)(2)(B) advisory committee's note on proposed rules, subdivision (d) ("When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if

12

untrue"). Smith's adoption of the informant's statements make them his own, and thus they comprise a party admission by Smith.

It is true that the jury also heard other statements made by the confidential informant, aside from those adopted by Smith. But those statements were admitted only for context of what was said (or done) afterwards, at which point this Court instructed the jury that those statements were not to be considered for the truth of the matter asserted. Cr. R. 100, Trial Tr. at 362-63. Because they were not offered for the truth, the statements are not hearsay. Fed. R. Evid. 801(c).[5] Both during the pretrial conference and in the order issued after it, the Court noted that hearsay objections would need to be analyzed on a line-by-line basis. Cr. R. 134, Pre-Trial Conf. Tr. at 8; 06/23/14 Order Mot. Lim. at 2. That level of attention to each objection and each statement is important because "context," standing alone, is not an "independent basis" to avoid the ban against hearsay. *United States v. Montez,* 858 F.3d 1085, 1089 (7th Cir. 2017). Rather, when an out-of-court statement is "admitted as context, the relevant legal question is still whether those statements are offered for their truth." *Id.* To be sure, if by "context" the statement is serving as an adoptive admission under Rule 801(d)(2)(B), then the statement is not hearsay. For example, consider an informant's statement to a defendant: "I saw you shoot Jones." The defendant responds, "And I'm glad I did it." It matters not whether the

---

[5]In his brief, Smith seems to argue that because the government argued that the person in the video was Smith, the government was improperly using the footage for the truth of the matter asserted. Pet.'s Br. at 9. But Smith offers no authority for the proposition that the visual *image* of one's person is hearsay.

informant is telling the truth (indeed, the informant could be tricking the defendant about having seen the shooting), but the informant's statement defines what "it" means when the defendant answers, "And I'm glad I did *it*." In that example, the defendant has adopted the informant's statements, and the adoptive-admission exemption applies.

Here, in light of the adoptive-admissions contained in the recordings, as well as the statements that were not even offered for the truth, it was reasonable for Goldberg to refrain from posing hearsay objections. Indeed, even now, Smith makes no attempt to go through the recording transcripts line-by-line to make specific hearsay objections. That failure dooms his argument. In the absence of Smith's objection to any specific statement, and an explanation of how it runs afoul of the rule against hearsay, he has failed to show that Goldberg performed unreasonably when declining to make hearsay objections.

That holding applies just as well to Smith's argument that Goldberg should have made some type of Confrontation Clause objection to the recordings. Under *Crawford,* the government violates the Confrontation Clause when it offers out-of-court "testimonial" statements by witnesses not available for cross-examination— regardless of whether the court considers the statements reliable. *Crawford v. Washington*, 541 U.S. 36, 54-56 (2004). But as explained in dealing with Smith's hearsay argument, the informant's statements were not hearsay, so the Confrontation Clause posed no obstacle to the recordings. *United States v. Smith*, 816 F.3d 479, 481 (7th Cir. 2016) ("Thus if a statement is not hearsay, because not

offered for its truth, it also is not 'testimonial' for the purpose of the Confrontation Clause.").

Finally, Smith offers no new argument that the informant's absence rendered the recordings inadmissible. As the Court previously explained in detail, it is readily possible to lay the foundation for the admission of recordings without the trial testimony of a participant in the conversation. 06/23/14 Order Mot. Lim. at 1-2. Because the government put on witnesses who testified to the chain of custody and to their familiarity with Smith's voice, it laid the proper foundation for the recordings. *See, e.g.*, R. 100, Trial Tr. 277-78, 289, 303-06, 357; R. 101, Trial Tr. 430-34, 452-53. So Goldberg acted reasonably in refraining from objecting on the basis of the confidential informant's absence alone. Indeed, part of Goldberg's strategy—and there were not a lot of options given the strength of the evidence—was to make the jury think that the government's evidence had a gap precisely because the informant did not testify. R. 100, Trial. Tr. at 269 ("[M]y particular strategy was not to have the informant here for the ghost informant argument."). To be sure, the government could respond by pointing out that the defense was free to subpoena the informant, but still Goldberg's approach was reasonable given the limited options in defending the case and given that the government does bear the burden of proof. The absence of the informant at trial is not a basis for an ineffective assistance of counsel claim in this case.

### C. Jail Phone Calls

Next, Smith advances a similar argument about recordings of telephone conversations that Smith had when he was detained at the county jail before trial. Smith contends that Goldberg should have objected to the admission of those recordings into evidence. Pet.'s Br. at 11-12. As discussed earlier, an ineffective assistance claim premised on a failure to object to evidence must fail if the underlying evidence is admissible. *See Hough v. Anderson,* 272 F.3d 878, 898 (7th Cir. 2001). Smith bears the burden to show that if his attorney had objected to the jail recordings, then they would not have been admitted. *See id.*

When the phone calls were recorded, Smith was detained in the Kankakee County Jail awaiting trial. Pet.'s Br. at 11; Gov.'s Resp. Br. at 11. His claims rest, in part, on his belief that the prison system did not warn him that his call may be recorded. *Id.* But this argument is a nonstarter. Prisoners and those they are speaking to have "no reasonable expectation of privacy when speaking on [a] prison phone." *United States v. Madoch,* 149 F.3d 596, 602 (7th Cir. 1998) (citing *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989)). The same is true for detainees. *United States v. Paxton*, 848 F.3d 803, 808 (7th Cir. 2017) (finding no "objectively reasonable expectation of privacy" in conversations taking place in the back of a squad car). Smith seems to acknowledge this in his own briefing, but still says he lacked notice that the recordings may be used against him. Pet.'s Br. at 11-12. When the government pointed out that there indeed was a jail-phone warning in

the recordings,[6] Smith says the only warning it gives is that the "location information" can be used. Pet.'s Reply Br. at 6. But the disclaimer warns about more than just location: "This call is subject to recording and monitoring and your location information may be collected and used by corrections and law enforcement personnel." Gov.'s Resp. Br. at 11 n.6. So the warning did alert pretrial detainees that the call was "subject to recording and monitoring," not just that location information (of both participants in the telephone call) could be separately provided to law enforcement. There was no legitimate basis to object to the jail-phone recordings, so it ultimately does not matter that Smith disagreed with Goldberg in stipulating to the calls' foundation, Pet.'s Br. at 11; *Id.,* Exh. B ¶ 6. (It is worth noting that, in fact, Smith actually signed the stipulation himself. Cr. R. 67, Stipulations.) Goldberg did not perform unreasonably in refraining from objecting to the jail-phone recordings.

### D. Mere Presence Instruction

Smith's next argument focuses on Goldberg's decision not to request a "mere presence" instruction as part of the jury instructions. Pet.'s Br. at 13-14. One of the Seventh Circuit's Pattern Jury Instructions states: "A defendant's presence at the scene of a crime and knowledge that a crime is being committed is not alone sufficient to establish the defendant's guilt." Pattern Instr. 5.11. Smith believes that he was entitled to the instruction, because in some of the video recordings, other

---

[6]In order to avoid alerting the jury that Smith was in pretrial detention, the exhibits that comprised the jail-phone recordings at trial did not include the disclaimer. Gov.'s Resp. Br. at 11.

unidentified individuals—beside Smith and the confidential source—were present. Pet.'s Br. at 13.

There are a couple of problems with this argument. First, to justify the instruction, a defendant must "identify evidence consistent with a theory of mere presence." *See United States v. Glover*, 479 F.3d 511, 519 (7th Cir. 2007). But in three of the four drug deals, Smith is the *only* person who meets with the informant. Gov. Exhs. 9-11 (audio and video of Oct. 14, 2010 deal); Gov. Exhs. 14A, 14B, 15 (audio and video of Oct. 19, 2010 deal); Gov. Exhs. 16-25A, 25B (audio and video of Nov. 4, 2010 deal). So the mere presence instruction could not apply to those three deals. And in the fourth deal, not even Smith argues that he was "standing around while others engaged in criminal activity—the typical scenario in which a mere presence instruction is warranted." *Glover*, 479 F.3d at 519.

Even if Smith had made a showing that the instruction arguably could have been given, he has not shown that Goldberg was ineffective for failing to request it. For one, asking for a mere presence instruction would have undermined Goldberg's theory of the case, which was (at least in part) an identity defense, in which he argued that Smith was not present and was not the person in the videos. Again, given the limited options available to defense counsel, Goldberg's choice was "reasonable strategy," which makes it impossible to conclude that he delivered ineffective assistance just because he did not ask for the instruction. *See United States v. Lathrop,* 634 F.3d 931, 938 (7th Cir. 2011).

### E. Jury Deliberations

The next instance of Goldberg's purported ineffective assistance arises from the jury deliberations. Specifically, during deliberations, the jury posed some questions via written notes to the Court. Smith contends that Goldberg should have asked the Court to ask the jurors some questions in response to two of the notes. In the first, a juror wrote that she was feeling "disrespected by one of the jury members. He is cutting people off and insulting people on numerous occasions," and the juror complained that the discourteous juror was telling others what to decide. Cr. R. 104, Trial Tr. at 772. The Court consulted with the parties about the proper response; Goldberg argued that "jurors quite often differ and disagree … . This is the jury we picked … I would say they have to continue to deliberate." *Id.* Goldberg then agreed with the Court's proposal that the jury be reminded of the *Silvern* instruction. *Id.*; *see also United States v. Silvern*, 494 F.2d 355, 358 (7th Cir. 1973). The Court contemplated bringing the jurors into the courtroom and reading it to the group; Goldberg, however, stated he was "afraid it may exacerbate this woman's feeling that she wants to be off and further cause more dissension." Cr. R. 104, Trial Tr. at 774. He suggested, rather, that the Court send the instruction to the jury room, so as not to incite more hard feelings among the jury. *Id.* at 775. The Court agreed to do so. *Id.* at 775-76. Smith now contends, via affidavit, that he actually wanted the jury to be questioned and told Goldberg as much. Pet.'s Br. at 15; *id.* Exh. C ¶¶ 6-7.

When another note came back—this time from another juror—asking that she be allowed "off this jury due to I cannot make a sound decision of this case," the Court again discussed the issue with the parties. Cr. R. 105, Trial Tr. at 781. Goldberg again proposed that the jurors should continue to deliberate, especially when he realized that this was a different juror from the one that sent the first note. *Id.* at 782, 784. With two jurors now expressing some type of problem, Goldberg reasoned that the more the jury deliberated, the more likely "we will have three, four jurors that have a problem, and I hope this moves to the benefit of the defense." *Id.* at 784. Smith now expresses via affidavit that he again asked Goldberg to do a jury inquiry. Pet.'s Br. at 16; *id.* Exh. C, ¶ 13. Smith's most alarming allegation is that Goldberg responded, "You are not paying me enough for all that would be necessary to do that and prolong this case. I have other cases I have to move on to." *Id.* ¶ 14.

Of course, if Smith's disturbing version of Goldberg's response was deemed to be true, then Goldberg acted unethically by failing to put his client's interest first. But Goldberg's on-the-record, contemporaneous proposal to instruct the jury to keep deliberating is entirely inconsistent with a desire to avoid prolonging the case. Goldberg explained that he was hoping for a snowball effect: now that a second juror had expressed a problem, more deliberations could produce "three, four jurors that have a problem, and I hope this moves to the benefit of the defense." *Id.* at 784. In other words, Goldberg was hoping that more deliberations would either entrench a hung jury or even produce an acquittal. But the premise of this proposal was *more*

deliberations and thus *more* time—and that is not consistent with Smith's contention that Goldberg was trying to move onto another case.

The other problem with Smith's argument is that, in order to prevail on the performance element, he must show that the performance was *objectively* unreasonable. Put another way, it would not be enough for defense counsel to have a subjectively deficient motive (like the desire to move onto another case); the performance must be objectively unreasonable. As discussed earlier, Goldberg reasonably took the tack that more deliberations could build momentum to a hung jury or, possibly, an acquittal. Smith's proposal (if indeed he made it at the time of trial) to pull the jury back into the courtroom could have made the dissenting (presumably, the defense-leaning jurors) antsy and put on the spot—and thus more likely to bend to pressure from the rest of the jury. At the least, a reasonable lawyer could so conclude. Goldberg did not perform unreasonably by refraining from asking for the jurors to be questioned.

### F. Cumulative Effect

Although it is true that, in evaluating a defense counsel's performance (and any resulting prejudice), the Court should consider the "cumulative effect of counsel's errors," *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989), it is unnecessary to do so here because no error occurred at all on the evidentiary issues raised by Smith and Goldberg's decisions otherwise boil down to reasonable legal strategy. There is no counsel error to add up in this case.

## G. Career Offender Enhancement

In May 2017, Smith moved for leave to amend his original § 2255 petition. Pet. Mot. Am. at 1. He seeks to add an argument, namely, that his Illinois conviction for delivering a controlled substance, 720 ILCS 570/401, does not qualify as a "controlled substance offense" under the career offender provision of the Sentencing Guidelines, U.S.S.G. § 4B1.1. Pet. Mot. Am. at 9-10. To support this argument, Smith invokes the Supreme Court's decision in *Mathis v. United States*, 136 S. Ct. 2243, 2253 (2016). *Mathis* interpreted the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), to reaffirm that a "violent felony" under that statute requires that the elements of the prior offense (that is, the one being proposed as the violent felony) must match or be narrower than that of the generic burglary (or some other qualifying, listed offense). *Id.* at 2253-54. As explained next, Smith's proposed amendment is untimely, procedurally defaulted, and, in any event, meritless.

### 1. Timeliness

When Smith originally filed his § 2255 motion on January 13, 2017, he was within the one-year limitations period because his conviction became final on March 21, 2016. 28 U.S.C. § 2255(f)(1). Smith did not seek leave to amend the § 2255 motion until May 30, 2017, so unless there was some basis to modify the one-year limitations period, § 2255(f)(2)-(4), the proposed amendment is untimely. The only possible exception that Smith suggests is that *Mathis* created a new right when it was decided on June 23, 2016 (after Smith's conviction became final). *See* Pet. Mot. Am. at 6-7. The problem, however, is that *Mathis* did not set forth a "new rule of

constitutional law," because it did not "depend on or announce any novel principle of constitutional law." *See Holt v. United States*, 843 F.3d 720, 722 (7th Cir. 2016) (discussing *Mathis v. United States,* 136 S. Ct. 2243 (2016)). *Mathis* was an exercise in statutory interpretation, so it did not reset the limitations period for Smith.

For the sake of completeness, it is worth noting too that Smith's proposed amendment does not relate back to the original § 2255 motion's filing date. Under Federal Rule 15(c), an amendment to a pleading can "relate[] back to the date of the original pleading" when the amendment asserts a claim arising out of the "same conduct, transaction, or occurrence" set out in the original filing. Fed. R. Civ. P. 15(c)(1)(B). Here, Smith's original § 2255 motion did not challenge any facet of the sentencing, so the new claim concerning the Sentencing Guidelines does not arise out of the same conduct, transaction, or occurrence at issue in his original petition. The proposed amendment does not relate back to the initial filing date.

## 2. Procedural Default

Even if the career-offender argument had been timely asserted for purposes of the one-year limitations period, Smith would face another procedural obstacle: he did not raise the issue at sentencing or in his direct appeal, so he defaulted the claim. Indeed, in Smith's sentencing memorandum, he agreed that the Sentencing Guidelines calculations were "technically correct and accurate." Cr. R. 110, Def. Sentencing Memo. at 2. During his sentencing hearing, Smith confirmed he had reviewed the Presentence Investigation Report with his attorney. Cr. R. 123, Tr. at 4. Defense counsel affirmed that there was no "technical objection" to the

calculation, only that he hoped the Court would pick a sentence below the Guidelines range. *Id.* at 10-11. No challenge to the career-offender provision was made on the direct appeal. So the claim is procedurally defaulted. Smith does not argue that his sentencing or appellate counsel (who replaced Goldberg) was ineffective for failing to assert the argument, which means that Smith proposes no constitutional claim as the vehicle by which he can present the Guidelines argument. The failure to raise this "nonconstitutional claim on direct appeal" means that he is "barred from raising it for the first time in this § 2255 petition … ." *Lanier v. United States,* 220 F.3d 833, 842 (7th Cir. 2000). The claim is defaulted.

### 3. Merits

Even if the Court could have reached the merits of Smith's career-offender argument, the claim still would fail because *Mathis* does not undermine the career-offender finding. In *Mathis,* the Supreme Court considered whether an Iowa burglary conviction qualified as a "violent felony" under the Armed Career Criminal Act, which lists "burglary" as a specified violent felony. *Mathis v. United States,* 136 S. Ct. 2243, 2248-49 (2016); 18 U.S.C. § 924(e)(2)(B)(ii). The Court reaffirmed its prior approach: a "state crime cannot qualify as a[] … predicate if its elements are broader than those of a listed generic offense." *Id.* at 2251 (citing *Taylor v. United States*, 495 U.S. 575, 602 (1990)). Even if the actual *conduct* that was the premise of the conviction fits the elements of the generic crime, the key is to compare *elements*, so a "mismatch of elements saves the defendant" from the enhanced sentence. *Id.* at 2251. It is true that, when a state law sets elements for multiple *crimes* in one

statutory provision, then the sentencing court can "look[] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id.* at 2249. But that "modified categorical approach" is permitted only when a state statute "'list[s] multiple elements disjunctively,' *not* when it simply 'enumerates various factual means of committing a single element.'" *United States v. Lynn*, 851 F.3d 786, 796 (7th Cir. 2017) (emphasis in original) (quoting *Mathis*, 136 S. Ct. at 2249).

None of this helps Smith. He argues that his 1998 sentence for delivery of a controlled substance under Illinois law, 720 ILCS 570/401, does not qualify as a "controlled substance offense" under the Guidelines career-offender provision. U.S.S.G. § 4B1.2(b); Pet. Mot. Am. at 3. But an element-by-element comparison between the Illinois law and the Guidelines definition of "controlled substance offense" shows that this Illinois drug law matches the definition. The version of the Illinois statute that was effective when Smith committed this crime (on October 29, 1996, Cr. R. 86, Presentence Report ¶ 32), provided in pertinent part:

> Except as authorized by this Act, it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled or counterfeit substance or controlled substance analog.

720 ILCS 570/401 (eff. Aug. 20, 1995). The Guidelines define "controlled substance offense" as a felony that

> prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance … or the possession of a controlled substance … with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b). Compare the two definitions: the elements of the Illinois crime are a subset of the Guidelines definition (which also covers importation). Nothing in *Mathis*—whether its reaffirmance of the categorical approach or its limitation on when to use the modified categorical approach—affects this conclusion.

Smith argues that a Fifth Circuit case, *United States v. Hinkle*, 832 F.3d 569, 571 (5th Cir. 2016), supports his argument. Pet. Mot. Am. at 9. In *Hinkle,* the Texas drug law at issue required only an "*offer* to sell" drugs. *Hinkle,* 832 F.3d at 571. (emphasis added). The Fifth Circuit held that an *offer* to sell did not constitute a "controlled substance offense" within the meaning of the Sentencing Guidelines. *Id.* The Guidelines definition covers manufacture, distribution, or possession with intent to distribute—and "offer" to sell is not quite any one of those, so the Texas law did not categorically match the Guidelines definition. *See id* at 572, 576-77.

In contrast, the Illinois law (excerpted earlier) does not list any conduct that would be broader than the Guidelines definition. Smith points out that the phrase "offered for sale" does appear in the statute, Pet. Mot. Am. at 9; at least it appears in the current version of the statute, which now says:

> Except as authorized by this Act, it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance *other than* methamphetamine and other than bath salts as defined in the Bath Salts Prohibition Act sold or *offered for sale* in a retail mercantile establishment as defined in Section 16-0.1.

720 ILCS 570/401 (emphases added). As the italicized text makes clear, however, the reference to "offered for sale" applies only to certain methamphetamine and bath salts when sold in in certain retail establishments. "Offered for sale" plays no

part in the elements of the crime. Section 401 of the Illinois Controlled Substances Act remains a "controlled substance offense" under the career-offender provision of the Guidelines.

## IV. Conclusion

For the reasons discussed, Smith's motion for relief under § 2255 is denied. At each stage of the case, Smith's defense counsel performed reasonably, especially in light of the limited options available given the weight of the evidence. And the Illinois drug law that was the premise of the career-offender enhancement clearly remains a "controlled substance offense" for Guidelines purposes. These conclusions are so clear that Smith has not made a substantial showing of the denial of a constitutional right. So no certificate of appealability shall issue. 28 U.S.C. § 2253(c)(1)(A).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 28, 2017